J-S20005-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SCOTT TIMOTHY WATKINS | : | |
| | : | |
| Appellant | : | No. 1726 EDA 2019 |

Appeal from the Judgment of Sentence Entered December 20, 2018
In the Court of Common Pleas of Carbon County Criminal Division at
No(s): CP-13-CR-0000798-2016

BEFORE:  SHOGAN, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY SHOGAN, J.:                    **FILED SEPTEMBER 18, 2020**

Appellant, Scott Timothy Watkins, appeals *nunc pro tunc* from the judgment of sentence entered following his convictions of simple assault by physical menace and harassment.[1]  We affirm.

The trial court thoroughly summarized the factual history of this case as follows:

> At approximately 8:30 P.M. on May 14, 2016, [Appellant] and Lisa Watkins, his wife, arrived at Sunny Rest Resort, an eighty to ninety-acre clothing optional resort located in Franklin and Towamensing Townships, Carbon County, Pennsylvania, for the opening weekend of the 2016 season.  (N.T., 3/6/18, pp.40-41, 183; N.T., 3/8/18, p.41).  During this first weekend of the season, which is open to members only, members socialize with one another and renew acquaintances.  (N.T., 3/6/18, pp.47, 133; N.T., 3/8/18, pp.38, 41).

---

[1] 18 Pa.C.S. §§ 2701(a)(3) and 2709(a)(1).

The Resort employs private security who patrol the grounds using golf carts. Their duties primarily are to assist members and guests and to keep the peace. (N.T., 3/6/18, pp.40, 45, 47, 128, 133, 161). They are not allowed to carry weapons and they do not enforce the law. (N.T., 3/6/18, pp.42-44; N.T., 3/8/18, pp.109-110). On this particular date, Christopher Wean and Jason Cerkan were working as security guards at the Resort. Each had worked there for several years and were known by both [Appellant] and his wife. (N.T., 3/6/18, pp.39, 46, 50, 57, 82-83, 128, 133, 135, 149-50, 154). In fact, [Appellant], who at one time had also worked as a security guard at the Resort, helped train and familiarize both Wean and Cerkan with their responsibilities as a security guard. (N.T., 3/6/18, pp.40-41, 45-46, 131, 156; N.T., 3/8/18, p.40).

At approximately 10:30 P.M. on May 14, 2016, as Wean and Cerkan were making their rounds, they spotted [Appellant] and his wife at an outdoor deck party. (N.T., 3/6/18, pp.48-49). Both were intoxicated. (N.T., 3/6/18, pp.49-50, 134-35, 160, 181, 184, 187). Mrs. Watkins asked if they would give her a ride to her trailer where she wanted to use the restroom and make another drink for herself. (N.T., 3/6/18, pp.50, 55-56, 135-36; N.T., 3/8/18, pp.49, 118-19). They agreed. At the Watkins' trailer, located approximately fifty to a hundred yards from the deck party, Mrs. Watkins invited both security guards to come inside and offered them some candy. (N.T., 3/6/18, pp.56-57). Wean and Cerkan were inside the trailer for approximately three minutes and then went outside to wait for Mrs. Watkins before returning her to the party. (N.T., 3/6/18, pp.56, 63, 138-39).

As the two were waiting outside, [Appellant] suddenly drove up, parked his vehicle on the road in front of the trailer, slammed the door of the vehicle shut, walked directly to the trailer - a distance of approximately twenty to twenty-five feet, passing Wean and Cerkan along the way and muttering something indecipherable as he passed and entered the trailer abruptly, slamming the door behind him. (N.T., 3/6/18, pp. 64-66, 77, 139-141; N.T., 3/8/18, p.59). Both Wean and Cerkan testified that [Appellant] was clearly upset at something. (N.T., 3/6/18, pp.66, 141).

Soon after [Appellant] entered the trailer, Wean and Cerkan heard [Appellant] screaming at his wife and, through a window, Wean saw [Appellant] strike his wife three times in the face.

(N.T., 3/6/18, pp.66-68). Wean told Cerkan what he saw and Cerkan, unsure of what to do, walked up to the trailer door and knocked. (N.T., 3/6/18, pp.68-69, 141-143). From inside the trailer, [Appellant] yelled, "Are you F'n kidding me?" (N.T., 3/6/18, pp.69, 143). Within seconds the door of the trailer flew open and Wean watched as [Appellant] drew a loaded handgun from his rear waistband and exited the trailer. (N.T., 3/6/18, pp.69, 143, 151).[1] As this was happening, Cerkan ran to the side of the trailer and disappeared. (N.T., 3/6/18, pp.70, 143, 148, 152).

> [1] What later turned out to be a loaded magazine clip, but which was unrecognizable by Wean at the time, dropped to the ground as [Appellant] was drawing his weapon and exiting the trailer. (N.T., 3/6/18, pp.69, 75, 147; N.T., 3/8/18, p.166). It is unclear whether this magazine clip was intentionally removed from the handgun by [Appellant] or accidentally became dislodged as [Appellant] drew his weapon. (N.T., 3/8/18, p.145). What is clear, is that a loaded round was in the gun's chamber when the gun was pointed at Wean. (N.T., 3/6/18, pp.115-16, 182-83, 198, 215-17; N.T., 3/8/18, pp.166-67).

[Appellant] approached Wean with his pistol drawn and pointed at Wean - his left hand cradling the gun from below and the trigger finger of his right hand on the trigger. (N.T., 3/6/18, pp.69-70, 88, 119; N.T., 3/8/18, pp.135, 171). In response, Wean stepped backwards several steps. (N.T., 3/6/18, pp.69, 71, 76). When [Appellant] reached where Wean was standing, approximately ten feet from the trailer, [Appellant] pressed the barrel of the pistol against Wean's left cheekbone, directly beneath his eye. (N.T., 3/6/18, pp.69-71, 76-77, 88, 116). For approximately a minute, the two stood facing one another without speaking. (N.T., 3/6/18, p.71). [Appellant] then lowered his weapon and told Wean to get out, at which point Wean slowly backed away from [Appellant], got in the golf cart, and drove away. (N.T., 3/6/18, p.72).

Wean testified that when the pistol was pressed against his cheek, he thought he was going to die. (N.T., 3/6/18, pp.72, 102). Later that same night, after the police were called and responded to the Resort, [Appellant's] 40 caliber handgun was recovered where he had placed it on an outside picnic table to the

- 3 -

left of the trailer without clearing or unloading the gun. (N.T., 3/6/18, pp.32, 179, 192-93, 214-15; N.T., 3/8/18, pp.140-41, 151, 166, 172). One live round was found in the chamber, confirming that the gun was loaded at the time it was pointed at Wean. (N.T., 3/6/18, pp.182-83, 198, 215-17; N.T., 3/8/18, pp.166-67).

At trial, [Appellant] testified on his own behalf. [Appellant] did not dispute that he possessed and pointed his pistol at Wean during the commission of this offense, however, [Appellant] testified he did so in self-defense. [Appellant's] testimony to support this claim follows.

According to [Appellant], when twenty minutes had passed and his wife, to whom he had been married for less than a year, had not returned to the party after leaving with Wean and Cerkan, he became concerned and decided to look for her at the trailer. (N.T., 3/8/18, pp.36, 49-50, 119-20, 170). As he pulled up in front of the trailer, [Appellant] claimed Wean and Cerkan were just then exiting the trailer, that Cerkan ran to the side of the trailer where he lost sight of him, and that Wean was walking in his direction. (N.T., 3/8/18, pp.54-57, 122). [Appellant] testified he walked directly from his vehicle to the trailer, that as he passed Wean on the way, Wean said, "What's up?", and he responded, "You tell me," and that as he walked past Wean, he smelled an odor of marijuana. (N.T., 3/8/18, pp.57-58, 75, 123-24, 126).

Once inside the trailer, [Appellant] testified he saw his wife stagger from the bathroom and fall to the floor. (N.T., 3/8/18, pp.60-61, 81-82, 128). According to [Appellant], his wife was more intoxicated than when she had left the party, and he believed she had been drugged. (N.T., 3/8/18, pp.60, 64, 74-75, 80-32, 128). [Appellant] admitted yelling "What the F's going on" to his wife and anyone who might be standing outside the trailer. (N.T., 3/8/18, pp.128-29, 146-47). It was at this point, [Appellant] claimed, he opened the door to make sure Wean and Cerkan had left the property. (N.T., 3/8/18, pp.82-84). When he did so, he saw Wean standing by the golf cart near the street, approximately twenty-five feet away, and yelled several times for him to "Get the 'F' out of there." (N.T., 3/8/18, pp.59, 84-85, 129-30, 132). At first Wean began to walk away, down the street, but he then turned and started walking towards [Appellant]. (N.T., 3/8/18, pp.84-85, 131-33).

[Appellant] testified he was standing in the trailer doorway as he yelled for Wean to leave and never left this doorway during the entire incident. (N.T., 3/8/18, pp.85, 90, 129-30). As Wean approached him, [Appellant] repeatedly shouted for him to leave, but Wean kept getting closer. (N.T., 3/8/18, pp.85-86, 135). [Appellant] testified that when Wean was approximately ten or fewer feet away, he pulled the gun from the small of his back, held it with both hands, and pointed it at Wean, and that he did so because he was concerned for his own safety and that of his wife - that he thought Wean might be under the influence of drugs,[2] that he thought Wean might be carrying a weapon,[3] and that he believed Wean was dangerous and prone to violence, Wean having once told [Appellant] that he had beaten his pregnant girlfriend and been convicted of assault.[4] (N.T., 3/6/18, pp.53, 94; N.T., 3/8/18, pp.85-87, 90-93, 96, 133, 135, 145-46, 156, 164, 172-74). [Appellant] testified he believed Wean was about to attack him and only after he drew his pistol and held it with both hands pointed at Wean did Wean turn and walk away. (N.T., 3/8/18, pp.87, 136, 156-57). Only then, after Wean had left, did [Appellant] admit to leaving the trailer and going outside to make sure Cerkan had also left. (N.T., 3/8/18, pp.87, 90, 137, 139, 158).

> [2] Wean denied drinking any alcoholic beverages or using any controlled substances that day. (N.T., 3/6/18, pp.47-48, 80, 106-107, 134-35, 187).
>
> [3] Wean denied owning or showing any guns to [Appellant], and [Appellant] admitted he did not see any weapons on Wean. (N.T., 3/6/18, pp.46-47, 107, 169; N.T., 3/8/18, p.134).
>
> [4] Wean testified that in 2001, when he was eighteen years old, he pled guilty to reckless endangerment and terroristic threats. He denied ever telling [Appellant] about this incident. (N.T., 3/6/18, pp.78-79, 91, 99-100, 108, 113, 115, 120).

[Appellant] denied being intoxicated and denied ever walking up to Wean and placing the barrel of his gun against Wean's cheekbone. He denied having his finger on the trigger and testified the safety was on. (N.T., 3/8/18, pp.89-90, 171-72). [Appellant] admitted not knowing whether his weapon was loaded when it was pointed at Wean, not checking to see whether the

magazine was in the gun, and not knowing when the clip fell out. (N.T., 3/8/18, pp.145, 166-67).

At the conclusion of jury deliberations, [Appellant] was found guilty of simple assault, attempting by physical menace to place another in fear of imminent serious bodily injury, a misdemeanor of the second degree, 18 Pa.C.S.A. § 2701(a)(3), and acquitted of recklessly endangering another person, 18 Pa.C.S.A. § 2705, also a misdemeanor of the second degree. [Appellant] was sentenced on December 20, 2018, to a period of imprisonment of no less than six nor more than eighteen months. This sentence was within the standard guideline range after application of the deadly weapon used sentencing enhancement. The court also had the benefit of a presentence investigation report at the time of sentencing.

[Appellant's] testimony, as indicated, differs materially from the Commonwealth's evidence, not only on what [Appellant] did and why, but also on where [Appellant] was located when his weapon was pointed at Wean (outside the trailer, in the front yard, near the road - as claimed by Wean, or while [Appellant] was standing in the doorway of his trailer), on whether the gun was loaded or unloaded, and on whether [Appellant] pressed the barrel of his gun against Wean's cheekbone, or simply pointed it at Wean from a distance.

Trial Court Opinion, 4/17/19, at 2-10.

On May 14, 206, Appellant was charged with simple assault and related crimes. The matter proceeded to a trial in October of 2017, which ended in a mistrial. Appellant was retried, and on March 9, 2018, a jury convicted him of simple assault, and the trial court convicted him of the summary offense of harassment. On December 20, 2018, the trial court sentenced Appellant to serve a term of incarceration of six to eighteen months for the conviction of simple assault and to pay a $300 fine for the conviction of harassment. Appellant filed a timely post-sentence motion. The trial court held a hearing

and denied the post-sentence motion on April 17, 2019. Appellant failed to file an appeal within thirty days of the date of the order.

On May 22, 2019, Appellant filed a motion seeking a determination regarding whether the April 17, 2019 order had been properly served upon the parties. On June 6, 2019, the parties and the trial court entered into a stipulation and order permitting Appellant to proceed with a direct appeal *nunc pro tunc*. On June 11, 2019, Appellant filed this appeal. Both Appellant and the trial court complied with Pa.R.A.P. 1925.

Appellant presents the following issues for our review:

1. Whether the [trial c]ourt erred in instructing the Jury to consider both Force and Deadly Force in its Jury Instruction? The jury should only have been given a justification use of force instruction. It was also error to allow jurors to choose which standard (force or deadly force) to apply.

2. Whether the [c]ourt erred in applying the Deadly Weapon Used Enhancement at Sentencing?

3. Whether the verdict was against the Weight of the Evidence in that Appellant provided credible and compelling evidence that he was acting within the law of justification as set forth in Pennsylvania statute?

Appellant's Brief at 4-5.

Appellant first argues that the trial court erred in instructing the jury with regard to self-defense. Appellant's Brief at 11-19. Appellant contends that the trial court should not have given self-defense instructions for both the use of non-deadly force and the use of deadly force. Appellant asserts that the charging of both levels of force permitted the jury to decide the applicable

law and confused the jury regarding which self-defense instruction should be applied. *Id*. at 12. Basically, Appellant alleges that the fact that he displayed a firearm did not amount to deadly force that required the instruction as requested by the Commonwealth. We disagree.

> In examining the propriety of the instructions a trial court presents to a jury, our [standard] of review is to determine whether the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. A jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions. The trial court is not required to give every charge that is requested by the parties and its refusal to give a requested charge does not require reversal unless the appellant was prejudiced by that refusal.

*Commonwealth v. Brown*, 911 A.2d 576, 582-583 (Pa. Super. 2006) (citing *Commonwealth v. Thomas*, 904 A.2d 964 (Pa. Super. 2006)).

In our inquiry, we are cognizant that "when evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper." *Commonwealth v. Charleston*, 94 A.3d 1012, 1021 (Pa. Super. 2014) (citation omitted). "The trial court is free to use its own expressions as long as the concepts at issue are clearly and accurately presented to the jury." *Commonwealth v. Ballard*, 80 A.3d 380, 407 (Pa. 2013) (citation omitted). The instructions must adequately, accurately, and clearly present the law to

the jury and must be sufficient to guide the jury in its deliberations. *Commonwealth v. Jones*, 672 A.2d 1353, 1358 (Pa. Super. 1996).

We have reviewed the briefs of the parties, the relevant law, the certified record, and the opinion of the trial court authored by the Honorable Roger N. Nanovic, President Judge of Carbon County. It is our determination that the trial court properly held the facts presented during the trial required the inclusion of both jury instructions. Therefore, we conclude that the opinion of the trial court correctly and adequately addressed the claim raised by Appellant. Trial Court Opinion, 4/17/19, at 11-19. Accordingly, we adopt the trial court's opinion as our own and affirm on its basis.[2]

Appellant next argues that the trial court erred in applying the deadly weapon used enhancement at sentencing. Appellant's Brief at 19-25. Appellant asserts that he did not use a deadly weapon, but merely possessed the firearm. Appellant claims that the trial court should have applied the deadly weapon possessed enhancement.

We observe that a "misapplication of the Sentencing Guidelines constitutes a challenge to the discretionary aspects of sentence." *Commonwealth v. Archer*, 722 A.2d 203, 209 (Pa. Super. 1998) (*en banc*). Thus, this Court has regarded challenges to the application of the deadly weapon enhancement in the Sentencing Guidelines as challenges to the

_____

[2] The parties are directed to attach a copy of that opinion in the event of further proceedings in this matter.

- 9 -

discretionary aspects of the sentence. *See Commonwealth v. Rhoades*, 8 A.3d 912, 915-916 (Pa. Super. 2010) (treating allegation that the trial court erred in applying the deadly weapon enhancement as a challenge to the discretionary aspects of sentencing).

"A challenge to the discretionary aspects of a sentence must be considered a petition for permission to appeal, as the right to pursue such a claim is not absolute." *Commonwealth v. McAfee*, 849 A.2d 270, 274 (Pa. Super. 2004) (citation omitted). An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:

> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. 720; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010) (citation omitted; brackets in original).

Where an appellant fails to comply with Pa.R.A.P. 2119(f) and the Commonwealth objects, the issue is waived for purposes of review. *Commonwealth v. Farmer*, 758 A.2d 173, 182 (Pa. Super. 2000). However, a failure to include the Pa.R.A.P. 2119(f) statement does not automatically waive an appellant's argument; rather, we are precluded from reaching the merits of the claim when the Commonwealth lodges an objection to the

- 10 -

omission of the statement. ***Commonwealth v. Roser***, 914 A.2d 447, 457 (Pa. Super. 2006) (quoting ***Commonwealth v. Love***, 896 A.2d 1276, 1287 (Pa. Super. 2006)).

Herein, the first two requirements of the four-part test are met because Appellant brought a timely appeal and raised the challenge in his post-sentence motion. However, Appellant failed to include in his appellate brief the necessary separate concise statement of the reasons relied upon for allowance of appeal pursuant to Pa.R.A.P. 2119(f). The Commonwealth has failed to object to this error by Appellant. Therefore, we will not consider the issue to be waived due to the omission. Accordingly, we next determine whether Appellant raises a substantial question requiring us to review the discretionary aspects of the sentence imposed by the trial court.

Appellant argues that the trial court abused its discretion by applying the deadly weapon used enhancement. Appellant's Brief at 19-25. We have stated that a challenge to the application of the deadly weapon enhancement presents a substantial question. ***Commonwealth v. Raybuck***, 915 A.2d 125, 127 (Pa. Super. 2006). Therefore, because Appellant has raised a substantial question, we will address the merits of Appellant's claim.

It is undisputed that sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. ***Commonwealth v. Fullin***, 892 A.2d 843, 847 (Pa. Super. 2006). In this context, an abuse of discretion is

not shown merely by an error in judgment. ***Id***. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias, or ill will, or arrived at a manifestly unreasonable decision. ***Id***.

Appellant argues the trial court should have implemented the deadly weapon "possessed" enhancement instead of the deadly weapon "used" enhancement. Appellant believes that the definition of the term "used" is so overbroad that it renders the definition of "possessed" meaningless. Appellant's Brief at 22. Appellant concedes that the deadly weapon enhancement is applicable to the facts of this case. ***Id***. However, Appellant limits his argument to which deadly weapon enhancement, "used" or "possessed," is more appropriate. ***Id***. at 24-25.

The following is the applicable enhancement as contained in the sentencing guidelines:

**§ 303.10. Guideline sentence recommendations: enhancements**

(a)    Deadly Weapon Enhancement.

(1)    When the court determines that the offender **possessed** a deadly weapon during the commission of the current conviction offense, the court shall consider the DWE/Possessed Matrix (§ 303.17). An offender has possessed a deadly weapon if any of the following were on the offender's person or within his immediate physical control:

(i)    Any firearm, (as defined in 42 Pa.C.S. § 9712) whether loaded or unloaded,

. . .

> (2)    When the court determines that the offender
> **used** a deadly weapon during the commission of the
> current conviction offense, the court shall consider the
> DWE/Used Matrix (§ 303.18).  An offender has used a
> deadly weapon if any of the following were employed
> by the offender in a way that threatened or injured
> another individual:
>
> > (i)    Any firearm, (as defined in 42
> > Pa.C.S.  §  9712)  whether  loaded  or
> > unloaded[.]

204 Pa.Code § 303.10(a)(1), (2) (emphasis added).

Before the deadly weapon enhancement can be applied to a guideline sentence, the sentencing judge must first determine whether the offender either possessed or used a deadly weapon during the commission of the current conviction offense.  204 Pa.Code § 303.10(a)(1), (2).  ***See also*** 204 Pa.Code § 303.9(b) (relating to deadly weapon enhancement sentence recommendations).  For purposes of the deadly weapon enhancement, the term "used" is defined to mean that the firearm was "employed by the offender in a way that threatened or injured another individual."  204 Pa.Code § 303.10(a)(2).[3]    Thus, under section 303.10(a)(2), when the trial court determines that the offender used a firearm during the commission of the

---

[3] We note that the term "possessed" is statutorily defined to mean that the firearm was "on the defendant's person or within his immediate control."  42 Pa.C.S. § 2154(b).

- 13 -

offense, the guideline applies if the offender used the firearm in a way that threatened or injured another individual.

In addition, we observe that during the commission of a crime, the possession of a firearm can escalate to use of the gun. As we stated in **Commonwealth v. Shull**, 148 A.3d 820, 832 (Pa. Super. 2016), "[the appellant's] mere possession of a gun transcended to his use of the gun as an implement of submission and fear when he decided to remove it from under his clothing and hold it—with finger on trigger—directly above [the victim's] face as she lay helplessly under his forcible control."

In addressing this claim, the trial court offered the following discussion:

[Appellant] did not merely possess a firearm. The gun at issue was not simply on [Appellant's] person or within his reach. To the contrary, [Appellant] deliberately drew the firearm from his rear waistband, held it in both hands, and pointed it directly at Wean. Whether he was ten feet away, as claimed by [Appellant], or [whether he] pressed the barrel of this weapon against Wean's cheek, as claimed by Wean, and whether the weapon was loaded or unloaded, the weapon was unquestionably utilized by [Appellant] in the commission of the offense for which he was convicted, simple assault, attempting by physical menace to place another in fear of imminent serious bodily injury.

Trial Court Opinion, 4/17/19, at 21-22.

Likewise, our review of the record reflects that during the confrontation between Appellant and Wean, Appellant pulled a pistol from his back waistband and approached Wean while holding the handgun with both hands and his finger on the trigger. N.T., 3/6/18, at 69-71. Appellant then placed the gun under Wean's left eye and held it there for nearly one minute. **Id**.

This evidence supports the trial court's conclusion that Appellant used a firearm in a way that threatened the victim, and the deadly weapon used enhancement applies. Thus, the trial court did not abuse its discretion when it employed the deadly weapon used enhancement of the sentencing guidelines. Consequently, Appellant's contrary claim lacks merit.

Appellant last argues that the verdict was against the weight of the evidence. Appellant's Brief at 25-27. Appellant contends that Wean was the aggressor in the situation and that Appellant believed that Wean had "done something to his wife based on his wife's unusual behavior." *Id*. at 25-26. Appellant states that his "testimony and behavior show an intent to control an uncertain and potentially dangerous situation as opposed to intending to physically menace Mr. Wean." *Id*. at 26. Appellant claims that the verdict of guilt rendered by the jury is so contrary to the weight of the evidence that it shocks one's sense of justice such that his conviction should be reversed and a new trial ordered.

In ***Commonwealth v. Clay***, 64 A.3d 1049 (Pa. 2013), our Supreme Court set forth the following standards to be employed in addressing challenges to the weight of the evidence:

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. ***Commonwealth v. Widmer***, 560 Pa. 308, 319, 744 A.2d 745, 751-[7]52 (2000); ***Commonwealth v. Brown***, 538 Pa. 410, 435, 648 A.2d 1177, 1189 (1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. ***Widmer***, 560 A.2d at 319-[3]20, 744 A.2d

at 752.  Rather, "the role of the trial judge is to determine that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" *Id*. at 320, 744 A.2d at 752 (citation omitted).  It has often been stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Brown*, 538 Pa. at 435, 648 A.2d at 1189.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.  **Brown**,* 648 A.2d at 1189.  Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence.  ***Commonwealth v. Farquharson***, 467 Pa. 50, 354 A.2d 545 (Pa. 1976).  One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Widmer*, 560 Pa. at 321-[3]22, 744 A.2d at 753 (emphasis added).

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered.  In describing the limits of a trial court's discretion, we have explained:

> The term "discretion" imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving

- 16 -

> effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

> **Widmer**, 560 A.2d at 322, 744 A.2d at 753 (quoting **Coker v. S.M. Flickinger Co.**, 533 Pa. 441, 447, 625 A.2d 1181, 1184-[11]85 (1993)).

**Clay**, 64 A.3d at 1054-1055 (emphasis in original). "Thus, the trial court's denial of a motion for a new trial based on a weight of the evidence claim is the least assailable of its rulings." **Commonwealth v. Diggs**, 949 A.2d 873, 879-880 (Pa. 2008).

The trial court addressed the challenge to the weight of the evidence as follows:

> As is apparent from our recitation of the facts earlier in this opinion, the Commonwealth's evidence was more than sufficient to prove these elements and to disprove the claim of self-defense, and the evidence to the contrary was not so overwhelming or pervasive as to undermine any material conflicts in the evidence resolved by the jury.[8] In its assessment of the credibility of witnesses and the weight it assigned to the evidence before it, the jury may well have determined, *inter alia*, that [Appellant] was the initial aggressor and provoked the confrontation with Wean; that [Appellant's] belief that he needed to protect himself against Wean was unreasonable in that there was nothing in Wean's conduct to support an objective belief that [Appellant] was in imminent and real danger such that any force was justified, much less the extent of force actually used;[9] or that [Appellant] was subject to a duty to retreat which was violated, any one of which would provide ample support for the jury's verdict. That the jury chose to accept the Commonwealth's version of what occurred and

to reject [Appellant's] claim of self-defense does not shock our conscience.[10]

> [8] Indeed, [Appellant] effectively concedes that his conduct satisfies the elements of the offense of which he was convicted, but claims he was justified in his actions, a claim the jury was well within its prerogative to disbelieve and reject.
>
> [9] The Commonwealth can negate a self-defense claim by proving the defendant "used more force than reasonably necessary to protect against death or serious bodily injury." **Commonwealth v. Truong**, 36 A.3d 592, 599 (Pa. Super. 2012) (*en banc*), *appeal denied*, 57 A.3d 70 (Pa. 2012).
>
> [10] In arguing that the verdict was against the weight of the evidence, [Appellant's] argument is premised upon weighing only the evidence favorable to [Appellant], rather than balancing this against the weight of the Commonwealth's evidence, as required by our case law.

Trial Court Opinion, 4/17/19, at 25-26.

Based upon our complete review of the record, we are compelled to agree with the trial court's conclusion that the jury's verdict was consistent with the evidence presented. Here, the jury, sitting as the finder of fact, was free to believe all, part, or none of the evidence against Appellant. The jury weighed the evidence, discounted Appellant's claim of self-defense, and concluded Appellant committed the crime of simple assault. We agree that these determinations are not so contrary to the evidence as to shock one's sense of justice. We decline Appellant's invitation to assume the role of fact-finder and reweigh the evidence presented at trial. Accordingly, we conclude

that the trial court did not abuse its discretion in refusing to grant relief on

Appellant's challenge to the weight of the evidence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/18/20

IN THE COURT OF COMMON PLEAS OF CARBON COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :
:
vs. : NO. 798 CR 2016
:
SCOTT TIMOTHY WATKINS, :
Defendant :

Cynthia A. Dyrda-Hatton, Esquire    Counsel for Commonwealth
Assistant District Attorney

Eric Winter, Esquire    Counsel for Defendant

MEMORANDUM OPINION

Nanovic, P.J. - April 17, 2019

Whether a defendant acted in self-defense can sometimes be difficult to determine, particularly when factual disputes exist over who was the aggressor, whether the defendant provoked the confrontation, and whether there existed a duty to retreat, and becomes even more complicated when the nature of the force used - whether deadly or non-deadly - is itself in dispute. Is the threat to shoot another in a vital part of the body with an openly visible firearm the use of deadly or non-deadly force? Does it make a difference if the firearm is loaded or unloaded? Should the jury, under certain circumstances, be instructed on the principles of self-defense applicable to both the use of deadly force and non-deadly force, as different rules apply depending on whether the force was deadly or not.

Here, Defendant contends that when he pointed his handgun

[FN-7-19]

at the head of the victim he did so in self-defense, to force the victim, who he believed was about to harm him, to back up, and that because his intent was to intimidate and threaten the victim, not to harm him, there was no use of deadly force, whether the firearm was loaded or unloaded, and that, consequently, the jury instruction given on the use of deadly force in self-defense was in error. Defendant further contends that at sentencing it was error to apply the deadly weapon used, rather than the deadly weapon possessed, sentencing matrix, and that his conviction of simple assault for putting another in fear of imminent serious bodily injury by physical menace was against the weight of the evidence.

### FACTUAL AND PROCEDURAL BACKGROUND

At approximately 8:30 P.M. on May 14, 2016, Scott Watkins, the Defendant, and Lisa Watkins, his wife, arrived at Sunny Rest Resort, an eighty to ninety-acre clothing optional resort located in Franklin and Towamensing Townships, Carbon County, Pennsylvania, for the opening weekend of the 2016 season. (N.T., 3/6/18, pp.40-41, 183; N.T., 3/8/18, p.41). During this first weekend of the season, which is open to members only, members socialize with one another and renew acquaintances. (N.T., 3/6/18, pp.47, 133; N.T., 3/8/18, pp.38, 41).

The Resort employs private security who patrol the grounds using golf carts. Their duties primarily are to assist members

[FN-7-19]
2

and guests and to keep the peace. (N.T., 3/6/18, pp.40, 45, 47, 128, 133, 161). They are not allowed to carry weapons and they do not enforce the law. (N.T., 3/6/18, pp.42-44; N.T., 3/8/18, pp.109-110). On this particular date, Christopher Wean and Jason Cerkan were working as security guards at the Resort. Each had worked there for several years and were known by both Defendant and his wife. (N.T., 3/6/18, pp.39, 46, 50, 57, 82-83, 128, 133, 135, 149-50, 154). In fact, Defendant, who at one time had also worked as a security guard at the Resort, helped train and familiarize both Wean and Cerkan with their responsibilities as a security guard. (N.T., 3/6/18, pp.40-41, 45-46, 131, 156; N.T., 3/8/18, p.40).

At approximately 10:30 P.M. on May 14, 2016, as Wean and Cerkan were making their rounds, they spotted Defendant and his wife at an outdoor deck party. (N.T., 3/6/18, pp.48-49). Both were intoxicated. (N.T., 3/6/18, pp.49-50, 134-35, 160, 181, 184, 187). Mrs. Watkins asked if they would give her a ride to her trailer where she wanted to use the restroom and make another drink for herself. (N.T., 3/6/18, pp.50, 55-56, 135-36; N.T., 3/8/18, pp.49, 118-19). They agreed. At the Watkins' trailer, located approximately fifty to a hundred yards from the deck party, Mrs. Watkins invited both security guards to come inside and offered them some candy. (N.T., 3/6/18, pp.56-57). Wean and Cerkan were inside the trailer for approximately three

[FN-7-19]
3

minutes and then went outside to wait for Mrs. Watkins before returning her to the party. (N.T., 3/6/18, pp.56, 63, 138-39).

As the two were waiting outside, Defendant suddenly drove up, parked his vehicle on the road in front of the trailer, slammed the door of the vehicle shut, walked directly to the trailer - a distance of approximately twenty to twenty-five feet, passing Wean and Cerkan along the way and muttering something indecipherable as he passed - and entered the trailer abruptly, slamming the door behind him. (N.T., 3/6/18, pp. 64-66, 77, 139-141; N.T., 3/8/18, p.59). Both Wean and Cerkan testified that Defendant was clearly upset at something. (N.T., 3/6/18, pp.66, 141).

Soon after Defendant entered the trailer, Wean and Cerkan heard Defendant screaming at his wife and, through a window, Wean saw Defendant strike his wife three times in the face. (N.T., 3/6/18, pp.66-68). Wean told Cerkan what he saw and Cerkan, unsure of what to do, walked up to the trailer door and knocked. (N.T., 3/6/18, pp.68-69, 141-143). From inside the trailer, Defendant yelled, "Are you F'n kidding me?" (N.T., 3/6/18, pp.69, 143). Within seconds the door of the trailer flew open and Wean watched as Defendant drew a loaded handgun from his rear waistband and exited the trailer. (N.T., 3/6/18,

[FN-7-19]
4

pp.69, 143, 151).[1] As this was happening, Cerkan ran to the side of the trailer and disappeared. (N.T., 3/6/18, pp.70, 143, 148, 152).

Defendant approached Wean with his pistol drawn and pointed at Wean – his left hand cradling the gun from below and the trigger finger of his right hand on the trigger. (N.T., 3/6/18, pp.69-70, 88, 119; N.T., 3/8/18, pp.135, 171). In response, Wean stepped backwards several steps. (N.T., 3/6/18, pp.69, 71, 76). When Defendant reached where Wean was standing, approximately ten feet from the trailer, Defendant pressed the barrel of the pistol against Wean's left cheekbone, directly beneath his eye. (N.T., 3/6/18, pp.69-71, 76-77, 88, 116). For approximately a minute, the two stood facing one another without speaking. (N.T., 3/6/18, p.71). Defendant then lowered his weapon and told Wean to get out, at which point Wean slowly backed away from Defendant, got in the golf cart, and drove away. (N.T., 3/6/18, p.72).

Wean testified that when the pistol was pressed against his cheek, he thought he was going to die. (N.T., 3/6/18, pp.72,

---

[1] What later turned out to be a loaded magazine clip, but which was unrecognizable by Wean at the time, dropped to the ground as Defendant was drawing his weapon and exiting the trailer. (N.T., 3/6/18, pp.69, 75, 147; N.T., 3/8/18, p.166). It is unclear whether this magazine clip was intentionally removed from the handgun by Defendant or accidentally became dislodged as Defendant drew his weapon. (N.T., 3/8/18, p.145). What is clear, is that a loaded round was in the gun's chamber when the gun was pointed at Wean. (N.T., 3/6/18, pp.115-16, 182-83, 198, 215-17; N.T., 3/8/18, pp.166-67).

[FN-7-19]
5

102). Later that same night, after the police were called and responded to the Resort, Defendant's 40 caliber handgun was recovered where he had placed it on an outside picnic table to the left of the trailer without clearing or unloading the gun. (N.T., 3/6/18, pp.32, 179, 192-93, 214-15; N.T., 3/8/18, pp.140-41, 151, 166, 172). One live round was found in the chamber, confirming that the gun was loaded at the time it was pointed at Wean. (N.T., 3/6/18, pp.182-83, 198, 215-17; N.T., 3/8/18, pp.166-67).

At trial, Defendant testified on his own behalf. Defendant did not dispute that he possessed and pointed his pistol at Wean during the commission of this offense, however, Defendant testified he did so in self-defense. Defendant's testimony to support this claim follows.

According to Defendant, when twenty minutes had passed and his wife, to whom he had been married for less than a year, had not returned to the party after leaving with Wean and Cerkan, he became concerned and decided to look for her at the trailer. (N.T., 3/8/18, pp.36, 49-50, 119-20, 170). As he pulled up in front of the trailer, Defendant claimed Wean and Cerkan were just then exiting the trailer, that Cerkan ran to the side of the trailer where he lost sight of him, and that Wean was walking in his direction. (N.T., 3/8/18, pp.54-57, 122). Defendant testified he walked directly from his vehicle to the

[FN-7-19]

trailer, that as he passed Wean on the way, Wean said, "What's up?", and he responded, "You tell me," and that as he walked past Wean, he smelled an odor of marijuana. (N.T., 3/8/18, pp.57-58, 75, 123-24, 126).

Once inside the trailer, Defendant testified he saw his wife stagger from the bathroom and fall to the floor. (N.T., 3/8/18, pp.60-61, 81-82, 128). According to Defendant, his wife was more intoxicated than when she had left the party, and he believed she had been drugged. (N.T., 3/8/18, pp.60, 64, 74-75, 80-82, 128). Defendant admitted yelling "What the F's going on" to his wife and anyone who might be standing outside the trailer. (N.T., 3/8/18, pp.128-29, 146-47). It was at this point, Defendant claimed, he opened the door to make sure Wean and Cerkan had left the property. (N.T., 3/8/18, pp.82-84). When he did so, he saw Wean standing by the golf cart near the street, approximately twenty-five feet away, and yelled several times for him to "Get the 'F' out of there." (N.T., 3/8/18, pp.59, 84-85, 129-30, 132). At first Wean began to walk away, down the street, but he then turned and started walking towards the Defendant. (N.T., 3/8/18, pp.84-85, 131-33).

Defendant testified he was standing in the trailer doorway as he yelled for Wean to leave and never left this doorway during the entire incident. (N.T., 3/8/18, pp.85, 90, 129-30). As Wean approached him, Defendant repeatedly shouted for him to

[FN-7-19]

7

leave, but Wean kept getting closer. (N.T., 3/8/18, pp.85-86, 135). Defendant testified that when Wean was approximately ten or fewer feet away, he pulled the gun from the small of his back, held it with both hands, and pointed it at Wean, and that he did so because he was concerned for his own safety and that of his wife - that he thought Wean might be under the influence of drugs,[2] that he thought Wean might be carrying a weapon,[3] and that he believed Wean was dangerous and prone to violence, Wean having once told Defendant that he had· beaten his pregnant girlfriend and been convicted of assault.[4] (N.T., 3/6/18, pp.53, 94; N.T., 3/8/18, pp.85-87, 90-93, 96, 133, 135, 145-46, 156, 164, 172-74). Defendant testified he believed Wean was about to attack him and only after he drew his pistol and held it with both hands pointed at Wean did Wean turn and walk away. (N.T., 3/8/18, pp.87, 136, 156-57). Only then, after Wean had left, did Defendant admit to leaving the trailer and going outside to make sure Cerkan had also left. (N.T., 3/8/18, pp.87, 90, 137, 139, 158).

---

[2] Wean denied drinking any alcoholic beverages or using any controlled substances that day. (N.T., 3/6/18, pp.47-48, 80, 106-107, 134-35, 187).
[3] Wean denied owning or showing any guns to Defendant, and Defendant admitted he did not see any weapons on Wean. (N.T., 3/6/18, pp.46-47, 107, 169; N.T., 3/8/18, p.134).
[4] Wean testified that in 2001, when he was eighteen years old, he pled guilty to reckless endangerment and terroristic threats. He denied ever telling Defendant about this incident. (N.T., 3/6/18, pp.78-79, 91, 99-100, 108, 113, 115, 120).

[FN-7-19]
8

Defendant denied being intoxicated and denied ever walking up to Wean and placing the barrel of his gun against Wean's cheekbone. He denied having his finger on the trigger and testified the safety was on. (N.T., 3/8/18, pp.89-90, 171-72). Defendant admitted not knowing whether his weapon was loaded when it was pointed at Wean, not checking to see whether the magazine was in the gun, and not knowing when the clip fell out. (N.T., 3/8/18, pp.145, 166-67).

At the conclusion of jury deliberations, Defendant was found guilty of simple assault, attempting by physical menace to place another in fear of imminent serious bodily injury, a misdemeanor of the second degree, 18 Pa.C.S.A. § 2701(a)(3), and acquitted of recklessly endangering another person, 18 Pa.C.S.A. § 2705, also a misdemeanor of the second degree. Defendant was sentenced on December 20, 2018, to a period of imprisonment of no less than six nor more than eighteen months. This sentence was within the standard guideline range after application of the deadly weapon used sentencing enhancement. The court also had the benefit of a presentence investigation report at the time of sentencing.

Defendant's testimony, as indicated, differs materially from the Commonwealth's evidence, not only on what Defendant did and why, but also on where Defendant was located when his weapon was pointed at Wean (outside the trailer, in the front yard,

[FN-7-19]
9

near the road – as claimed by Wean, or while Defendant was standing in the doorway of his trailer), on whether the gun was loaded or unloaded, and on whether Defendant pressed the barrel of his gun against Wean's cheekbone, or simply pointed it at Wean from a distance.

Defendant requested a jury instruction for self-defense by use of non-deadly force. The Commonwealth requested that if the jury were instructed on self-defense, the instruction should be that given with respect to the use of deadly force. Because the facts could support either, depending on what evidence the jury accepted as true, both instructions were given with the jury instructed that they would have to determine whether or not the gun was loaded and where Defendant was standing (inside or outside the trailer) when the gun was pointed at Wean. In Defendant's post-sentence motion filed on December 31, 2018, Defendant claims this was error and that even if the gun was loaded, it was not used as a deadly weapon, but simply brandished with the intent to intimidate Wean, not to harm him. In a similar vein, Defendant claims we erred by sentencing pursuant to the deadly weapon used rather than the deadly weapon possessed enhancement. Finally, Defendant requests a new trial, contending the jury's verdict was against the weight of the evidence.

DISCUSSION

1. *Instructing on the Use of Deadly and Non-Deadly Force in Self-Defense When a Genuine Factual Issue Exists as to Which was Used*

Self-defense, also known as justification, recognizes the common sense principle that a person can protect himself against the unlawful use of force by another provided the level of force used by him is not disproportionate to the level of force used against him. This principle is codified in Section 505 of the Crimes Code. 18 Pa.C.S.A. § 505. Section 505(a) of the Crimes Code applies to self-defense generally. Commonwealth v. Childs, 142 A.3d 823, 829 (Pa. 2016). Section 505(b)(2) deals specifically with the use of deadly force in self-defense. *Id.*

As a general rule, an individual is justified in using force upon another person "when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S.A. § 505(a). The use of deadly force is justified only if the actor believes that such force is immediately necessary to protect himself against death or serious bodily injury. 18 Pa.C.S.A. § 505(b).

To justify the use of deadly force, the evidence must establish three elements: "(a) that the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force

[FN-7-19]
11

P223

against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the [use of such force]; and (c) that the defendant did not violate any duty to retreat." Commonwealth v. Mouzon, 53 A.3d 738, 740 (Pa. 2012) (citations and quotation marks omitted).[5] The requirement of a reasonable belief encompasses both a subjective and objective component: the defendant "must have acted out of an honest, bona fide belief that he was in imminent danger" and such belief must be objectively reasonable in light of the facts as they appear to the defendant. Mouzon, *Id.* at 752 (citation and quotation marks omitted). "Whether a defendant acts out of an honest, bona fide belief and whether such a belief was reasonable, are issues properly resolved by the trier of fact." Commonwealth v. Perez, 698 A.2d 640, 646 (Pa.Super. 1997) (citation omitted).

"A jury charge on self-defense must be given upon request where the jury would have a possible basis for finding self-defense." Commonwealth v. Bailey, 471 A.2d 551, 553 (Pa.Super. 1984). "If there is evidence presented that could support a claim of self-defense, it is up to the fact-finder to pass upon

---

[5] "[A]s an evidentiary matter, . . . when self-defense is properly at issue, evidence of the victim's prior convictions involving aggression may be admitted, if probative, either (1) to corroborate the defendant's alleged knowledge of the victim's violent character, to prove that the defendant was in reasonable fear of danger, or (2) as character/propensity evidence, as indirect evidence that the victim was in fact the aggressor." Mouzon, 53 A.3d at 741.

its credibility and therefore it is improper for a trial court to exclude such consideration by refusing a charge thereon." Commonwealth v. Bailey, 471 A.2d at 553. When the elements of self-defense are met and accepted by the fact-finder, the defense "justifies" what would otherwise be criminal conduct on the part of the defendant, and the result is an acquittal. Mouzon, 53 A.3d at 751.

When the evidence, from whatever source, justifies a finding of self-defense, "the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not acting in self-defense." Mouzon, 53 A.3d at 740 (citation and quotation marks omitted). "The Commonwealth sustains that burden of negation if it proves any of the following: that the [defendant] was not free from fault in provoking or continuing the difficulty which resulted in the [use of such force]; that the [defendant] did not reasonably believe that he was in imminent danger of death or great bodily harm, and that it was necessary to [use such force] in order to save himself therefrom; or that the [defendant] violated a duty to retreat or avoid the danger." Id. at 740-41 (citation and quotation marks omitted). "If the Commonwealth establishes any one of these three elements beyond a reasonable doubt, then the conviction is insulated from a defense challenge to the sufficiency of the evidence where self-protection is at issue." Commonwealth v.

[FN-7-19]
13

.

Burns, 765 A.2d 1144, 1149 (Pa.Super. 2000), *appeal denied*, 782 A.2d 542 (Pa. 2001).

As pertains to this issue, Defendant argues first that whether or not the pistol he pointed at Wean was loaded, his actions did not constitute the use of deadly force and, therefore, it was error for the court to instruct the jury on the elements of self-defense when deadly force is involved. As the court understands Defendant's position, unless the evidence established that it was Defendant's conscious intent to actually cause death or serious bodily injury, the mere pointing of his weapon at Wean, whether loaded or unloaded, and whether or not pressed against Wean's cheekbone, was at most a "show of force," what Defendant describes as "brandishing" in his brief, and not the use of deadly force. Interrelated to this argument, Defendant claims it was error for the court to instruct the jury on the elements of self-defense for both the use of force as permitted in 18 Pa.C.S.A. § 505(a) and the use of deadly force as permitted in 18 Pa.C.S.A. §§ 505(b)(2), (2.1), and (2.2), since this could only confuse the jury in its review of the evidence and which instruction to apply.

Chapter 5 of the Crimes Code entitled "General Principles of Justification" contains a definitional section wherein the term "deadly force" is defined as

P226

> Force which, under the circumstances in which it is used, is readily capable of causing death or serious bodily injury.

18 Pa.C.S.A. § 501 (Definitions). Here, as previously described, Defendant pressed the barrel of a loaded pistol against Wean's left cheekbone directly beneath his eye and held it there for approximately a minute. Defendant was intoxicated and minutes earlier was furious as he walked from his vehicle to his trailer. (N.T., 3/6/18, p.66). This evidence, if accepted by the jury, clearly demonstrated the use of force under circumstances "readily capable of causing death or serious bodily injury."

Defendant contends that the word "use" in the Crimes Code's definition of "deadly force" is ambiguous and that to correctly interpret the meaning of "deadly force" we should adopt the definition given in Section 3.11 of the Model Penal Code which provides as follows:

> (2) "deadly force" means force that the actor uses with the purpose of causing or that he knows to create a substantial risk of causing death or serious bodily injury. Purposely firing a firearm in the direction of another person or at a vehicle in which another person is believed to be constitutes deadly force. A threat to cause death or serious bodily injury, by the production of a weapon or otherwise, so long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute deadly force.

Model Penal Code, Section 3.11 (Definitions).

P227

The simple answer to Defendant's argument is that while Pennsylvania's Crimes Code is in large part derived from the Model Penal Code, the Model Penal Code was never adopted verbatim as the Penal Code for this Commonwealth, and there are clear differences between the two. As is evident, while the Model Penal Code definition for "deadly force" concentrates on the intent of the actor to actually cause death or serious bodily injury, the definition in the Crimes Code focuses on the danger posed by the actor's conduct and whether it is "readily capable of causing death or serious bodily injury." Given this difference in the actual language enacted by our state legislature in defining the term "deadly force", and the principle that "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit," 1 Pa.C.S.A. § 1921(b), we have no difficulty in concluding that the Commonwealth's evidence, if accepted by the jury, supported a finding of the use of deadly force by Defendant against Wean. Cf. Commonwealth v. Mayfield, 585 A.2d 1069, 1077 (Pa.Super. 1991) (en banc) (finding that the mere brandishing of a knife during the course of a fight in anticipation of using it in self-defense constituted the use of deadly force); Commonwealth v. Gonzales, 483 A.2d 902, 904 (Pa.Super. 1994) (holding that the mere act of pointing a gun at an individual, even if no

[FN-7-19]
16

attempt is made to shoot, constitutes an assault to which the defendant was entitled to raise the issue of self-defense).[6]

Defendant complains as well that we erred in instructing the jury on the elements of self-defense applicable both when deadly force is used and when non-deadly force is used by the defendant. What Defendant fails to appreciate is that at the time the jury was instructed, whether the gun was loaded or unloaded when pointed at Wean was as yet undetermined by the jury, either finding being consistent with the evidence presented and the jury's right to accept all, none, or some of the evidence presented by the Commonwealth. Commonwealth v. Mayfield, 585 A.2d at 1071. If the gun was loaded, self-defense by use of deadly force was at issue; if unloaded, the question before the jury was Defendant's justification for the use of non-deadly force. Given these circumstances, to properly evaluate Defendant's claim of self-defense based on its determination of whether Defendant employed deadly or non-deadly force, it was necessary that the jury be given both instructions.

"In charging a jury, it is the primary duty of the trial judge to clarify issues so that the jury may understand the

---

[6]In so describing the holding in Gonzales, the court in Mayfield further noted that implicit in this holding is that the mere pointing of the gun constituted an act of using deadly force. 585 A.2d at 1077.

[FN-7-19]
17

questions to be resolved." Commonwealth v. Mayfield, 585 A.2d at 1075) (citation and quotation marks omitted). "As a general rule the trial court should instruct the jury on the law applicable to the facts of the case before it and should charge only on those points and issues which arise out of the evidence and arguments presented." *Id.* Instructions which "as a whole [are] inadequate or not clear or [have] a tendency to mislead or confuse rather than clarify a material issue" constitute grounds for a new trial. Passarello v. Grumbine, 87 A.3d 285, 296-97 (Pa. 2014).

Before instructing the jury on the elements of self-defense applicable when deadly force and when non-deadly force is used, the following preliminary instruction was given:

> Now, I want to go to the issue of self-defense. The Defendant has raised the issue of whether he acted in self-defense when he pointed his firearm at the alleged victim, Christopher Wean. Self-defense is called justification in the law of Pennsylvania. If the Defendant's actions were justified, you cannot find him guilty beyond a reasonable doubt. Since the Commonwealth has the burden of proof in this case, the Commonwealth must prove to you beyond a reasonable doubt that the Defendant did not act in justifiable self-defense, and the rules differ in self-defense as to whether the force used was deadly force or non-deadly force.
> The first matter that you must consider in deciding whether the Commonwealth has met its burden in this regard is what kind of force the Defendant used at the time of this incident. There are two kinds, deadly and non-deadly. The Commonwealth claims that deadly force was used by the Defendant and it must prove that claim beyond

[FN-7-19]
18

a reasonable doubt, so I first want to instruct you on self-defense with respect to deadly force.

For purposes of this instruction, the use of deadly force is such force that under the circumstances in which it is used is readily capable of causing death or serious bodily injury. In order to meet that definition, in this case, the Commonwealth needs to prove that there was, in fact, a cartridge in the chamber of this firearm. If the gun was unloaded or did not have a cartridge in the chamber, then it was not necessarily readily capable of causing death or serious bodily injury.

\* \* \*

(N.T., 3/9/18, pp.76-77).

This instruction, together with the entirety of the instructions when read as a whole, clearly explained to the jury the reason why both instructions on justification were given. This approach to giving both instructions is recognized as well in the current standard jury instructions when a genuine issue exists regarding the nature of the force used. *See* Pa.SSJI (Crim) § 9.501 (2012), Subcommitee Note.

2.  *Applicability of Deadly Weapon Used Enhancement for Sentencing*

Defendant next contends that we abused our discretion in the sentence imposed, applying the deadly weapon used enhancement, rather than the deadly weapon possessed enhancement. This claim raises a challenge to the discretionary aspects of sentencing which, to be reviewed, requires, *inter alia*, that Defendant raise a substantial question that the

[FN-7-19]
19

sentence appealed from is not appropriate under the Sentencing Code. *See* Commonwealth v. Kneller, 999 A.2d 608, 613 (Pa.Super. 2010) (*en banc*) ("[A] challenge to the application of the deadly weapon enhancement implicates the discretionary aspects of sentencing."), *appeal denied*, 20 A.3d 485 (Pa. 2011); Commonwealth v. Allen, 24 A.3d 1058, 1064 (Pa.Super. 2011) (noting the need to raise a substantial question before a discretionary aspect of sentencing will be reviewed). Such a question is raised when the deadly weapon used enhancement is applied. Commonwealth v. Tavarez, 174 A.3d 7, 10 (Pa.Super. 2018), *appeal denied*, 189 A.3d 385 (Pa. 2018).

The Sentencing Guidelines explain the "use" and "possession" deadly weapon enhancements as follows:

(a) Deadly Weapon Enhancement.

(1) When the court determines that the offender possessed a deadly weapon during the commission of the current conviction offense, the court shall consider the DWE/Possessed Matrix (§ 303.17(a)). An offender has possessed a deadly weapon if any of the following were on the offender's person or within his immediate physical control:

(i) Any firearm, (as defined in 42 Pa.C.S. § 9712) whether loaded or unloaded, or

(ii) Any dangerous weapon (as defined in 18 Pa.C.S. § 913), or

(iii) Any device, implement, or instrumentality designed as a weapon or capable of producing death or serious bodily injury where the court determines that the

[FN-7-19]
20

offender intended to use the weapon to threaten or injure another individual.

(2) When the court determines that the offender used a deadly weapon during the commission of the current conviction offense, the court shall consider the DWE/Used Matrix (§ 303.17(b)). An offender has used a deadly weapon if any of the following were employed by the offender in a way that threatened or injured another individual:

(i) Any firearm, (as defined in 42 Pa.C.S. § 9712) whether loaded or unloaded, or

(ii) Any dangerous weapon (as defined in 18 Pa.C.S. § 913), or

(iii) Any device, implement, or instrumentality capable of producing death or serious bodily injury.

204 Pa.Code § 303.10. As expressly stated in this section, the deadly weapon used enhancement applies when the offender uses any firearm (whether loaded or unloaded) in a way that threatens or injures the victim while committing the particular offense. See, e.g., Commonwealth v. Shull, 148 A.3d 820, 832 (Pa.Super. 2016) (concluding that defendant's "mere possession of a gun transcended to his use of the gun" when he removed the gun from under his clothing and pointed it at victim's face during attempted robbery). "The trial court may not disregard an applicable enhancement when determining the appropriate sentencing ranges." Tavarez, 174 A.3d at 10.

Here, Defendant did not merely possess a firearm. The gun at issue was not simply on Defendant's person or within his

[FN-7-19]
21

reach. To the contrary, the Defendant deliberately drew the firearm from his rear waistband, held it in both hands, and pointed it directly at Wean. Whether he was ten feet away, as claimed by Defendant, or pressed the barrel of this weapon against Wean's cheek, as claimed by Wean, and whether the weapon was loaded or unloaded, the weapon was unquestionably utilized by Defendant in the commission of the offense for which he was convicted, simple assault, attempting by physical menace to place another in fear of imminent serious bodily injury. 18 Pa.C.S.A. § 2701(a)(3). *See also* Commonwealth v. Hopkins, 747 A.2d 910, 914-15 (Pa.Super. 2000) (observing that a factfinder is entitled to infer that a victim will be placed in mortal fear when a defendant visibly brandishes a firearm).

3. *Verdict Supported by the Weight of the Evidence*

Defendant's final claim of error is a motion for new trial on the basis that the verdict was against the weight of the evidence. Since "[t]he fact-finder, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence," this is an extremely hard standard to meet. Commonwealth v. Tielsch, 934 A.2d 81, 94 (Pa.Super. 2007), *appeal denied*, 952 A.2d 677 (Pa. 2008).

"A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts

[FN-7-19]
22

would have arrived at a different conclusion." Commonwealth v. Clay, 64 A.3d 1049, 1055 (Pa. 2013). "A verdict is against the weight of the evidence where certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." Commonwealth v. Lyons, 833 A.2d 245, 258 (Pa.Super. 2003) (quoting Commonwealth v. Widmer, 744 A.2d 745, 751-52 (Pa. 2000)), appeal denied, 879 A.2d 782 (Pa. 2005). "It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." Commonwealth v. Clay, 64 A.3d at 1055 (citation and quotation marks omitted).

In Commonwealth v. Cash, 137 A.3d 1262 (Pa. 2016), the Pennsylvania Supreme Court stated:

> The decision to grant or deny a motion for a new trial based upon a claim that the verdict is against the weight of the evidence is within the sound discretion of the trial court. Thus, "the function of an appellate court on appeal is to review the trial court's exercise of discretion based upon a review of the record, rather than to consider de novo the underlying question of the weight of the evidence." An appellate court may not overturn the trial court's decision unless the trial court "palpably abused its discretion in ruling on the weight claim." Further, in reviewing a challenge to the weight of the evidence, a verdict will be overturned only if it is "so contrary to the evidence as to shock one's sense of justice."

[FN-7-19]
23

Commonwealth v. Cash, 137 A.3d at 1270 (internal citations omitted). A trial court's determination that a verdict is not against the weight of the evidence or against the interest of justice is "one of the least assailable reasons" for denying a new trial. Commonwealth v. Clay, 64 A.3d at 1055 (citation and quotation marks omitted).

The elements of the simple assault offense of which Defendant was convicted are (1) that Defendant attempted to put Wean in fear of imminent serious bodily injury; (2) that Defendant did so by the use of "physical menace"; and (3) that Defendant's conduct in this regard was intentional. See Pa.SSJI(Crim) § 15.2701D (2006); see also Commonwealth v. Barnett, 384 A.2d 965, 967-68 (Pa.Super. 1978). With respect to Defendant's claim of self-defense, it was for the jury to determine whether Wean was the aggressor as contended by Defendant, whether Defendant was free of provocation, whether Defendant's belief that he was in danger was real and reasonable, whether Defendant used deadly or non-deadly force and whether Defendant's use of such force was reasonable or excessive under the circumstances, and whether Defendant had a duty to retreat, including where the assault occurred.[7]

---

[7] "In cases not involving deadly force, there is no legal duty to retreat. Commonwealth v. Pollino, 467 A.2d 1298, 1300 (Pa. 1983). When deadly force is involved, a duty to retreat exists when "the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work. . . ."

[FN-7-19]
24

P236

As is apparent from our recitation of the facts earlier in this opinion, the Commonwealth's evidence was more than sufficient to prove these elements and to disprove the claim of self-defense, and the evidence to the contrary was not so overwhelming or pervasive as to undermine any material conflicts in the evidence resolved by the jury.[8] In its assessment of the credibility of witnesses and the weight it assigned to the evidence before it, the jury may well have determined, *inter alia*, that Defendant was the initial aggressor and provoked the confrontation with Wean; that Defendant's belief that he needed to protect himself against Wean was unreasonable in that there was nothing in Wean's conduct to support an objective belief that Defendant was in imminent and real danger such that any force was justified, much less the extent of force actually used;[9] or that Defendant was subject to a duty to retreat which was violated, any one of which would provide ample support for the jury's verdict. That the jury chose to accept the

---

18 Pa.C.S.A. § 505(b)(2)(ii). Therefore, if the jury determined Defendant exercised deadly force, he was under no duty to retreat if he was standing in the doorway of his trailer at the time, but, if in the yard outside the trailer, a duty to retreat existed. *See* 18 Pa.C.S.A. § 501 (Definitions) (the term "dwelling" does not include any portion of a yard surrounding a residence); Commonwealth v. Maltese, 2018 WL 4102814 *3 (Pa.Super. 2018), *appeal denied*, 2019 WL 1146703 (Pa. 2019).

[8] Indeed, Defendant effectively concedes that his conduct satisfies the elements of the offense of which he was convicted, but claims he was justified in his actions, a claim the jury was well within its prerogative to disbelieve and reject.

[9] The Commonwealth can negate a self-defense claim by proving the defendant "used more force than reasonably necessary to protect against death or

Commonwealth's version of what occurred and to reject Defendant's claim of self-defense does not shock our conscience.[10]

## CONCLUSION

In accordance with the foregoing, it was appropriate and necessary to charge the jury on the elements of self-defense applicable to the use of both deadly and non-deadly force, Defendant was properly sentenced in accordance with the deadly weapon used enhancement, and the jury's verdict was not against the weight of the evidence.

BY THE COURT:

_____ P.J.

2019 APR 17 P 1:08
CARBON COUNTY
CLERK
FILED

---

serious bodily injury." Commonwealth v. Truong, 36 A.3d 592, 599 (Pa.Super. 2012) (en banc), appeal denied, 57 A.3d 70 (Pa. 2012).

[10] In arguing that the verdict was against the weight of the evidence, Defendant's argument is premised upon weighing only the evidence favorable to Defendant, rather than balancing this against the weight of the Commonwealth's evidence, as required by our case law.

[FN-7-19]
26